IN THE
# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

No. 3:21-CV-1819
Before the Honorable Christopher C. Conner

**George Ivan Lopez**, *et al.*,

Plaintiffs,

versus

**John E. Wetzel**, *et al.*,

Defendants.

FILED
HARRISBURG, PA

SEP 1 2 2022

PER _____ JBR _____
DEPUTY CLERK

---

# Brief in Response
## to Defendants' Objections

---

The Honorable Chief Magistrate Judge Karoline Mehalchick
recommends denying the defendants' motion to dismiss.

The defendants object.
Plaintiffs respond.

---

George Ivan Lopez, Darien Houser,
Gerald Watkins, Ralph Stokes,
Jose Uderra, Richard A. Poplawski,
Plaintiffs, pro se.

S.C.I. Phoenix
1200 Mokychic Drive
Collegeville, PA 19426

Tuesday, September 6, 2022

# Table of Contents

**Table of Citations**                                          ii

**Introduction**                                                1

**Standards of Review**                                         1

**Summary of the Argument**                                     2

**I.  The magistrate did not err by denying qualified immunity
on the plantiffs' Eighth Amendment claim.**                    3

    A. The magistrate's report correctly found a constitutional violation,
which the defendants do not contest.                            3

    B. This Court should deny immunity even before analyzing analogous cases.   4

    C. The magistrate's report correctly identified a clearly established right.   7

    D. *Porter v. Pa. Dep't of Corr.* does not automatically entitle the defendants
to immunity at the pleading stage.                              8

**II. The magistrate did not err by denying qualified immunity
on the plantiffs' Fourteenth Amendment claim.**                9

    A. The magistrate's report properly identified the applicable standard.   9

    B. The defendants' proposed standard is inconsistent with this circuit's law.   11

    C. The magistrate's report correctly found the plaintiffs' liberty interest.   13

    D. Because the plaintiffs' liberty interest was clearly established in a mater-
ially identical case, the magistrate properly denied qualified immunity   17

**Conclusion**                                                  19

**Signatures**                                                  20

**Certificate of Timely Filing**                                21

**Certificate of Compliance - Word Count**  21

**Certificate of Service**                                      21

# Table of Citations

*Carroll v. Carman*, 574 U.S. 13 (2014)  4, 5

*Doty v. Cty. of Lassen*, 37 F.3d 540 (9th Cir. 1994) . . . . . . . 7

*Estate of DiMarco v. Wyo. Dep't of Corr.*,
   473 F.3d 1334 (10th Cir. 2007)  12

*Estelle v. Gamble*, 429 U.S. 97 (1976) . . . . . . . . . . . . . 7

*Farmer v. Brennan*, 511 U.S. 825 (1994)  7

*Gatto v. Lackawanna Cnty.*,
   2021 U.S. Dist. LEXIS 189465  (M.D. Pa.) . . . . . . . . . 8-9

*Haines v. Kerner*, 404 U.S. 519 (1972)  9

*Hewitt v. Helms*, 459 U.S. 460 (1983) . . . . . . . . . . . . . 14

*Hicks v. Feeney*, 770 F.2d 375 (3d Cir. 1985)  18

*Hollihan v. Pa. Dep't of Corr.,*  159 F. Supp. 3d 502 (2015) . . . . 5

*Hope v. Pelzer,* 536 U.S. 730 (2002)  6, 7, 18

*Johnson v. Wetzel*, 209 F.Supp. 3d 766 (2016) . . . . . . . . . 6

*Kane v. Barger*, 902 F.3d 185 (3d Cir. 2018)  18

*Kingsmill v. Szewczak,* 117 F. Supp. 3d 657 (E.D. Pa. 2015) . . . 6

*Newland v. Reehorst*, 328 F. App'x 788 (3d Cir. 2009)  9

*Oatway v. Am. Int'l Grp., Inc.*, 325 F.3d 184 (3d Cir. 2003) . . . 9

*Palakovic v. Wetzel*, 854 F.3d 209 (3d Cir. 2017)  7

*Pearson v. Callahan*, 555 U.S. 223 (2009) . . . . . . . . . . 8, 9

*Porter v. Clarke*, 923 F.3d 348 (4th Cir. 2019)  12

*Porter v. Pa. Dep't of Corr.*, 974 F.3d 431 (3d Cir.) . . . . . . . 4, 8, 14, 19

*Prieto v. Clarke,* 780 F.3d 245 (4th Cir. 2015)  11-13, 15

*Renchenski v. Williams*, 622 F.3d 315 (3d Cir. 2010) . . . . . .   15

*Rezaq v. Nalley*, 677 F.3d 1001 (10th Cir. 2012)   12

*Sandin v. Conner,* 515 U.S. 472 (1995) . . . . . . . . . . . .   *passim* - § II

*Shoats v. Horn*, 213 F.3d 140 (3d Cir. 2000)   10-11

*Stewart v. Wenerowicz,*
    2015 U.S. Dist. LEXIS 114307 (E.D. Pa. 2015) . . . . . . .   6

*Thompson v. Commonwealth*, 878 F.3d 89 (4th Cir. 2017)   7

*United States v. Lanier,* 520 U.S. 259 (1997) . . . . . . . . .17 n.

*Vitek v. Jones*, 445 U.S. 480 (1980)   15

*Wilkinson v. Austin*, 545 U.S. 209 (2005) . . . . . . . . . .   10-11

*Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549 (3d Cir. 2017)   6, *passim* - § II

*Yentzer v. Potter Cnty.*, 2022 U.S. Dist. LEXIS 55915 (M.D. Pa.) . .   9

## Constitutional Provisions, Statutes, Other Authorities

U.S. Const. Amend XIII   *passim* - §I

U.S. Const. Amend XIV . . . . . . . . . . . . . . . . . .   *passim* - §II

28 U.S.C. § 1983   4

61 Pa. C.S. § 4303 . . . . . . . . . . . . . . . . . . .   14-15

1971 Op. Atty Gen. Pa. 1   14

## Introduction

Defendant DOC officials kept these six mentally ill plaintiffs in the strictest form of isolation devisable, years after the cruelty of their confinement became obvious to all the world, including the Third Circuit Court of Appeals. Once the plaintiffs emerged from their ordeal—missing components of their very selves—they banded together to present their claim to be compensated for their needless, gratuitous suffering.

Defendants are accustomed to wielding authority, accustomed to being beyond reproach. Their motion to dismiss takes immunity for granted. They've got a golden ticket, pre-punched by the Third Circuit, they contend. If this Court disagrees, *so what?* they say. They threaten an appeal in their renewed motion to stay discovery.

When the Honorable Chief Magistrate Judge Karoline Mehalchick cast a shade of doubt on their immunity defense, the defendants were stunned like comedian Chris Rock at the Academy Awards. Their objections, which have a certain air of petulance about them, were received by the plaintiffs on August 25, 2022. *See* exhibit A.

The defendants, faced with dozens of similar actions (some featuring appointed counsel), chose *this* group—George Ivan Lopez & Co., *pro se*—to make an example.

So be it. May it please the Court.

## Standards of Review

The plaintiffs hold all the advantages as the Court mulls dismissal at the pleading stage. Under the rules of civil procedure, the complaint merely needs to give fair notice of the plaintiffs' claims. The Court assumes the veracity of the facts as pleaded. All the inferences from those facts—which must be drawn in the plaintiffs' favor—have to nudge the claims across the line from *speculative* to *plausible*. Dismissal is a harsh remedy at

this stage, and is only appropriate if it appears certain that the plaintiffs shall fail.

It would also favor the plaintiffs if Judge Mehalchick's recommendations were entitled to the deference of, say, being reviewed for an abuse of discretion. Instead, the review is *de novo*. But that's okay because the report is not erroneous in any way.

## Summary of the Argument

Because of the way the defendants argue their two objections—conceding the Eighth Amendment violation but denying the existence of the plaintiffs' liberty interests—this response takes matching divergent approaches. Immunity for the defendants' cruel and unusual conduct is contingent upon a *fact*-intensive inquiry; the factual basis of the due-process claim is sufficiently clear, though, so it is more a question of *law*. No formulaic method satisfies. This Court receives a bespoke pair of arguments, carefully crafted for the occasion.

To start, there is emphasis on the defendants' tacit concession that their conduct was unlawful. How long have they known? Maybe that doesn't even matter, though, because qualified immunity itself is problematic, especially in the Eighth Amendment context. This Court could cut its immunity inquiry brutally short by recognizing, as it has before, that *deliberate indifference* and *objectively reasonable conduct* are mutually exclusive concepts, and that officials are *never* free to inflict obvious, wanton cruelty.

Should the Court proceed to the analogy-drawing step, however, it will need some facts with which to do it. Dismissal is not appropriate at the pleading stage because some factual development is necessary to bolster the theory of material similarity to cases decided well before the plaintiffs' torment came to an end.

Then comes the deep dive into the liberty interests of prisoners in long-term isolation. The evolution of the standard is traced back, and the lineage of this circuit's sound approach is examined. Along the way, the defendants' proposed mutant standard gets exposed as fatally flawed, contaminated by disfavored law from a bygone era.

The defendants' claim to immunity is built on flimsy dicta. There is no such thing as prospective immunity. That ignores an entire body of law purpose-built to guide courts in drawing analogies from precedent. The Supreme Court teaches that there can be liability in novel circumstances—even where questions have been left open, as here.

Plaintiffs hammer loudly on the immateriality of the distinguishing factor between this case and fundamentally similar, right-establishing precedent; but it's the defendants who are deafening in their silence about the penological relevancy of the plaintiffs' capital sentences. They shirk their burden-holders' obligation to destroy the analogy. So they are not entitled to qualified immunity.

## I. The magistrate did not err by denying qualified immunity on the plantiffs' Eighth Amendment claim.

### A. The magistrate's report correctly found a constitutional violation, which the defendants do not contest.

The defendants spare this Court some effort in analyzing the immunity defense by conceding the underlying violation. Nowhere in their motion to dismiss or their objections do they contest the infringement on the plaintiffs' Eighth Amendment rights.

That is extra-ordinary. The plaintiffs cannot let it go unnoticed and unemphasized. Especially because their acknowledgment brings up a burning question that is central to the next step of the immunity inquiry: how long did they know?

Did this pro se action trigger a sudden epiphany for corrections professionals?

Unlikely. It's also hard to believe that officials realized the error of their ways in November 2019, released the new Death-Row Policy on December 3, and made it effective December 10. *See* compl. at ¶ 65.

They must have gleaned it from case law sometime prior to December 2019—or else the plaintiffs would have *still* been isolated, on account of their active death sentences, when *Porter v. Pa. Dep't of Corr.*, their golden-ticket case, was decided in September 2020. 974 F.3d 431 (3d Cir.). Logic dictates that there must have been some period of time during which the defendants knew they were acting unconstitutionally, but kept it up. That's the story told by Defendant John Wetzel's summary rejection of the ACLU's concerns in early 2017. *See* doc. 46, ex. B.

To enjoy immunity, the unconstitutionality of the defendants' conduct needs to have been "beyond debate." *Carroll v. Carman*, 574 U.S. 13, 16 (2014). Well, it *must* have been beyond debate, judging by the fact that they do not bother debating it.

**B. This Court should deny immunity even before analyzing analogous cases.**

There are plenty of cases that announce appropriately specific constitutional principles, but the Court need not even reach the tricky analogizing portion of the qualified-immunity question. Plaintiffs offer three alternative bases on which to adopt the magistrate's recommendation to deny immunity.

**First**, qualified immunity is unlawful: it has no textual basis in the Constitution or § 1983 and was, itself, *not clearly established* during either the Founding or Reconstruction Eras. Judge Mehalchick, probably cognizant of Her Honor's inability to overrule the U.S. Supreme Court, did not address this argument, which appears at length on page 18 of the plaintiffs' joint brief opposing dismissal.

Plaintiffs expect that qualified immunity—a tyrannogenic, judge-devised work-around—will some day find itself under scrutiny by the justly fanatical originalists on Mitch McConnell's Supreme Court. Since this case could become the vehicle for The People's historic challenge, the plaintiffs preserve the issue and invite this Learned Court to showcase its renowned erudition, in the name of Liberty and Justice for All.

**Second**, deliberate indifference is inconsistent with objectively reasonable conduct, which is a requisite for entitlement to qualified immunity. Think about it. How can an official who willfully disregards a serious risk of harm believe, at the same time, that his conduct passes constitutional muster? How can that conduct *be* objectively reasonable—i.e., lawful—in any possible scenario? It is a "plainly incompetent," "knowing[] violat[ion of] the law," and should not be protected by immunity. *Carroll*, 574 U.S. at 16.

The Court confronted this in a suit about the DOC's "One Good Eye" Policy, where it found that "state actors who are the subject of well-pleaded claims of deliberate indifference cannot invoke qualified immunity at the Rule 12 stage of litigation." *Hollihan v. Pa. Dep't of Corr.,* 159 F. Supp. 3d 502, 513 (M.D. Pa. 2016) (Conner, J.).

This case presents an extreme example: actual, educated knowledge of catastrophic danger, which yielded studied inaction over years of careful deliberation. This isn't some street cop deciding, in the heat of the moment, whether to put some punk in a headlock, or fire on a felon fleeing in an automobile. Insofar as qualified immunity could be compatible with notions of ordered liberty (such as the necessity of governance), the police officer should be immune, in his own person, from monetary damages—for now.

But not here. Not the President of the Association of State Correctional Administrators; who stood before this Court and admitted his awareness of the horrifying peril

5

(*Johnson v. Wetzel*, 209 F.Supp. 3d 766, 779 (2016)); whose entire team of attorneys cannot come up with the thinnest penological rationale when pressed squarely on the question. He cannot be entitled to rip up a letter from the ACLU and say, *sue us, you animals, we hate you!* from behind a shield of immunity. Where's the common sense?

The **third** reason this Court should deny immunity without even considering analogous cases is because the cruelty of the defendants' conduct was obvious. The Supreme Court has clarified that, in the Eighth Amendment context, common sense *can* prevail: "obvious cruelty," especially when imposed without penological objective, will defeat a claim to qualified immunity. *Hope v. Pelzer,* 536 U.S. 730, 745 (2002).

Courts of this circuit have followed course: *Kingsmill v. Szewczak,* 117 F. Supp. 3d 657, 669 (E.D. Pa. 2015) ("this is the type of case where the alleged conduct is outrageous enough, and the broad contours of the right sufficiently well known" to deny immunity); *Stewart v. Wenerowicz,* 2015 U.S. Dist. LEXIS 114307, *37 (E.D. Pa., Aug. 27, 2015) (denying immunity "because of the obviousness of the danger, and because the right to safe and humane conditions is clearly established").

The plaintiffs could offer a 10-page exegesis of the literature on isolation. But since this Court has been applauded for producing "a prime example of the judiciary's increasing recognition of the scientific evidence of the harms of solitary confinement," the plaintiffs presume the point is well-taken. *Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549, 573 (3d Cir. 2017) (citing *Johnson v. Wetzel, supra* (Conner, J.)).

Plaintiffs seize on this unique chance to respectfully impress something upon this Court: it's worse than they say. Reading about it does little justice. When you're alone in that tiny room, day after week after month after year, you become something un-human.

You become untethered to social context first, then to reality, finally you lose your *self*. If given an opportunity to be tied to a hitching post like Larry Hope, you'd never pass it up—unless it was too late, and you had withdrawn, became lost in raving lunacy, or hanged yourself with your bootlaces between count times

Defendants' conduct here was far more technically wanton than in *Hope*. At least there, prison officials had the arguable goal of coercing Hope into working on the Alabama chain-gang, or punishing him for wrasslin' with the guards on the work bus.

Here, the plaintiffs would have been ecstatic for chain-gang duty, if only to break up the mind-numbing monotony of their existence. Their mistreatment, it looks increasingly clear, had one purpose: causing human suffering. And "there is a clear consensus among the circuits . . . that an infliction of pain and suffering without penological justification violates the Eighth Amendment in an array of contexts." *Thompson v. Commonwealth*, 878 F.3d 89, 103 (4th Cir. 2017).

### C. The magistrate's report correctly identified a clearly established right.

In their brief opposing dismissal, the plaintiffs pointed to *Palakovic v. Wetzel*, 854 F.3d 209 (3d Cir. 2017), for the proposition that their right to adequate mental health treatment was clearly established. Doc. 46 at 25. Judge Mehalchick traced that right back to the seminal cases of *Estelle v. Gamble*, 429 U.S. 97 (1976), *Farmer v. Brennan*, 511 U.S. 825 (1994), and a string of cases applying them in the mental-health context. *See*, e.g., *Doty v. Cty. of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994) ("Requirements for mental health care are the same as those for physical health care needs").

This was not contrary to the law. Unless we accept the defendants' suggestion that prisoners with certain kinds of sentences have less rights.

### D. *Porter v. Pa. Dep't of Corr.* does not automatically entitle the defendants to immunity at the pleading stage.

The defendants' featured argument—their only argument—has superficial appeal. But not enough to cause the plaintiffs to wither because (a) *Porter*'s holding applied only to Ernest Porter—such is the nature of an *as-applied*—challenge and (b) this case is at the pleading stage, "where the precise factual basis for the plaintiff's claim may be hard to identify." *Pearson v. Callahan*, 555 U.S. 223, 238 (2009).

The defendants read *Porter* as broad as could be: they claim they are "entitled to qualified immunity with respect to **any** claims under the Eighth Amendment arising out of the formerly restrictive conditions on the CCU." Defs' Objs. at 9 (heavy emphasis in original). Imagine that. One case's as-applied holding controls the diverse experiences of 100+ individuals, spread out over several housing units at three different institutions, they contend. To the point where nothing that *ever* happened on *any* of the CCUs was cruel and unusual. But that cannot be. Porter never visisted SCI Graterford's notorious J block. He never experienced the supermax-like conditions at Phoenix before the reform.

Men cannot be viewed as cookie-cutter copies of one another. One size doesn't fit all. Consider the nature of mental illness. The classic metaphor is a scrambled jigsaw puzzle: here, some pieces missing; there, a piece jammed in sideways; jagged borders all around. Each man's mind is unique. Some are far more vulnerable.

And, is it possible that some especially disfavored convicts—habitual grievance filers, say—were more severely neglected?

Because of these uncertainties (and others), this Court has observed that "it is generally unwise to venture into a qualified immunity analysis at the pleading stage, as it is necessary to develop the factual record in a vast majority of cases." *Gatto v.*

*Lackawanna Cnty.*, 2021 U.S. Dist. LEXIS 189465, *26 (Conner, J.) (*citing Newland v. Reehorst*, 328 F. App'x 788, 791 n. 3 (3d Cir. 2009); *Pearson*, 555 U.S. at 239 (the qualified immunity inquiry is "an uncomfortable exercise where the answer may depend on a kaleidoscope of facts not yet fully developed").

It's hard to even formulate arguments in the fog of the pleading stage, but "development of a factual record . . . will better illuminate whether the [immunity] defense applies." *Yentzer v. Potter Cnty.*, 2022 U.S. Dist. LEXIS 55915, *16 (M.D. Pa., March 28, 2022) (Conner, J.). All parties can then reconvene on motions for summary judgment.

Today's question is not whether the plaintiffs will ultimately prevail, but whether they are "entitled to offer evidence to support the claims." *Oatway v. Am. Int'l Grp., Inc.*, 325 F.3d 184, 187 (3d Cir. 2003). The claim, drafted pro se, should only be dismissed now if "it appears beyond a doubt that the plaintiff[s] can prove no set of facts . . . which would entitle [them] to relief." *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).

Can this Court be that sure, so early? After what the plaintiffs have endured, they deserve the opportunity to offer evidence to support the theory of *Solitary+* (*see* doc. 46 at 27-28), which was credited by Chief Magistrate Judge Mehalchick.

## II. The magistrate did not err by denying qualified immunity on the plantiffs' Fourteenth Amendment claim.

### A. The magistrate's report properly identified the applicable standard.

When a sharply divided Supreme Court decided *Sandin v. Conner* in 1995, the majority was driven, in part, by a desire to keep prisoners' trivial complaints from masquerading as state-created liberty interests entitled to the solicitude of the federal judiciary. 515 U.S. 472, 482-83 (citing examples). The Court abrogated the method of

parsing the mandatory language of state laws and correctional regulations in search of new rights supposedly created by negative implication. *Id*. Going forward, only conditions that cause an "atypical and significant hardship"—i.e., not things one should expect to happen in prison on a given day—could plausibly fall within the aegis of the Fourteenth Amendment. *Id*. at 484. For all its practicality, the nebulous new standard was criticized in a dissenting opinion as liable to leave the Court's audience "at sea, unable to fathom" its contours. *Id*. at 490, n. 2 (Ginsburg, J.). Indeed, the new standard bred "inconsistent conclusions" among Courts of Appeals, particularly about the "baseline" against which to measure atypicality. *Wilkinson v. Austin*, 545 U.S. 209, 223 (2005).

When, five years later, the Third Circuit got ahold of *Shoats v. Horn*—a case involving long-term isolation of a prisoner who was a certified *menace*—they devised a two-factor inquiry: (1) the duration of the challenged conditions; and (2) whether the conditions overall imposed a significant hardship in relation to the ordinary incidents of prison life. 213 F.3d 140, 144 (2000). That is, the *Shoats* court "answered the liberty-interest question based on the conditions themselves." *Williams v. Sec'y, Pa. Dep't of Corr.*, 848 F.3d 549, 565 (3d Cir. 2017).

After five more years, another solitary-confinement case, *Wilkinson v. Austin*, was decided by a unanimous Supreme Court and proved that the Third Circuit, in *Shoats*, had truly nailed the standard: "duration" is a proper consideration, the Court agreed, 545 U.S. at 224; and the "touchstone" of the liberty-interest inquiry *is,* in fact, "the nature of the conditions themselves." *Id*. at 223. As for the troublesome baseline question, the Court did not need to reach it. The harsh, indefinite isolation at issue was atypical and significant against "any plausible baseline." *Id*. There would have been a

liberty interest even if those extreme conditions were "necessary and appropriate." *Id.*

Then, in 2017, came *Williams v. Sec'y, Pa. Dep't of Corr.*, a case where the conditions (on Pennsylvania's Death Row) "could not be meaningfully distinguished" from *Wilkinson*'s Ohio State Penitentiary; conditions, "in some respects," were even "more severe." 848 F.3d at 564. The *Williams* court reaffirmed the *Shoats* standard. For atypicality, the court held that the terms "ordinary" and "routine," as used in *Sandin*, counsel deployment of "a general metric (general population)" as a comparator. *Id.* The harm caused by solitary confinement is the "*essence* of atypical and significant hardship," the court found. *Id.* at 560 (emphasis added).

So, notwithstanding Justice Ginsburg's concern, the Third Circuit Court of Appeals charted a consistent course through *Sandin*'s somewhat uncertain waters. *Sandin–Shoats–Wilkinson–Williams* forms a jurisprudential straight line. From DeMont Conner's 30 days in the hole, to Russell Shoats' eight years, to the indefinite isolation of the *Wilkinson* plaintiffs, and the indeterminate confinement of Shawn Walker and Craig Williams on Pennsylvania's capital-case unit, each port brought us closer—doctrinally and factually—to the destination we've reached today.

### B. The defendants' proposed standard is inconsistent with this circuit's law.

Defendants reject the general-population baseline comparator prescribed by *Shoats* and affirmed in *Williams*. In doing so, they cite *Prieto v. Clarke,* 780 F.3d 245, 252 (2015), for the Fourth Circuit's proposition that state law can delineate "ordinary incidents of prison life" for certain classes of offenders (e.g., death-sentenced convicts), by prescribing conditions of confinement.

By relying on *Prieto*, the defendants have dropped a mortar shell into the tube upside-down. For one thing, the split *Prieto* decision hinges on the existence of "Virginia Dep't of Corr. Operating Procedure 830.2(D)(7), 460.1A(I)." *Id.* at 267. But this approach, contrary to *Sandin*, elevates regulatory language and betrays the "touchstone" of *Wilkinson*—"conditions themselves." 545 U.S. at 223. For good reason, this method is not followed in this jurisdiction, where "the Constitution [is the] guide." *Williams,* 848 F.3d at 565. The *Prieto* approach exploded in *Williams* because "[s]tate policy cannot undermine a constitutional interest." *Id.* at 571.

*Williams* even cited the "vigorous" *Prieto* dissent as an admirable example of the "growing chorus" being sung about the perils of solitary confinement, to which the Third Circuit, with gusto, added its voice. *Id.* at 573-74. Besides, four years later, the Fourth Circuit went on to uphold an injunction designed to remediate the conditions on Virginia's Death Row: *Porter v. Clarke*, 923 F.3d 348 (2019). So much for VDOC Operating Procedures.

Defendants also cite *Rezaq v. Nalley*, 677 F.3d 1001, 1012 (10th Cir. 2012), in their effort to induce some wiggle into the standard. Sure, the phrase they quote appears to support their position. But *Rezaq*, after first acknowledging the Tenth Circuit's inconsistent approaches (*id.* at 1011), went on to apply a "totality of conditions" test. Finding the existence of segregated prisoners' liberty interests is guided by four factors: (1) penological objectives, (2) severity of the conditions, (3) interference with parole, etc., and (4) indeterminacy. *Id.* (citing *Estate of DiMarco v. Wyo. Dep't of Corr.*, 473 F.3d 1334, 1342 (10th Cir. 2007)). The *DiMarco-Rezaq* test, if applied here, would hurt the defendants badly. Shall we try it?

12

No. The Third Circuit Court of Appeals has it right. Even if not, the *Shoats* standard, affirmed in *Williams*, bound the magistrate judge and binds this Court.

**C. The magistrate's report correctly found the plaintiffs' liberty interest.**

After properly assessing the "length and nature" of the plaintiffs' isolation, the magistrate judge found these factors "sufficient to allege a hardship outside of those imposed in the ordinary course of prison life." Report and Recommendation at 16-17.

This was an error, the defendants contend, because the plaintiffs still had active death sentences, thus the conditions on Death Row, however severe, were not atypical "for them," but were "within the expected perimeters of the sentence imposed." Def. Objs. at 14, ¶ 2 (quoting *Williams*, 848 F.3d at 569).

The time has come to dispatch the defendants' favorite dicta, upon which they hang their hopes of defeating the plaintiffs' due-process claim.

Start by locating this quote within the *Williams* opinion. It appears immediately under the subheading "Purportedly Contrary Precedent Cited by Defendants." 848 F.3d at 569. Turns out, these comments do not even fit the description of garden-variety *obiter dicta*: independent judicial remarks with no bearing on the holding (Latin: "made in passing"). These words are a summary of *the defendants' argument*—it's double-dicta. Actually, they are a *rejection* of the defendants' argument. It's double-dog-dicta.

What argument was the court rejecting? Note 131 reveals that the defendants had cited three cases for the proposition that isolation is to be expected by death-condemned prisoners. One of them was *Prieto*, whose reasoning was blown to smithereens on page 565. The other two were 38- and 41-year-old cases from the Second and Fifth Circuits, respectively (both of which predate *Sandin* by over a decade, i.e., are creatures of the

bygone regulation-parsing era dominated by *Hewitt v. Helms*, 459 U.S. 460 (1983)).

All the court was saying was that none of those three cases applied to Williams. It is inconceivable that the court would credit their flawed methodologies if the question became central, as here. Even if their premises—essentially, that state regulations trump the Constitution—were somehow acceptable, those cases would be highly distinguishable from this case because Pennsylvania state law *cuts the other way*.

Notice how the defendants don't bring this up anymore. They used to argue (as recently as *Williams*) that 61 Pa. C.S. § 4303 requires solitary confinement for the death-condemned. But there are three problems with that interpretation, each more damaging than the last. Here's why their once-cherished statute has been left on the side of the Pennsylvania Turnpike:

(1) In 1971, the Attorney General of Pennsylvania promulgated an official interpretation: "The Death Sentence Act [now 61 Pa. C.S. § 4303] . . . mandates solitary confinement . . . only at such time as the Governor's warrant is received . . . . [I]t is clear [that the Act] provides no legal authority for holding prisoners who are under the sentence of death in solitary confinement until such time as a valid Governor's warrant shall issue." 1971 Op. Atty Gen. Pa. 1.

The defendants were somehow able to disregard this interpretation of state statute for *50 years*. Eventually, however, courts took notice.

(2) In *Porter v. Pa. Dep't of Corr.*, the court finally struck the knell for the defendants' reading of § 4303: "Porter remains in the CCU as a matter of [DOC] discretion, not because of any statutory requirement." 974 F.3d at n.9. The court's September 2020 recognition came nine months too late to benefit the plaintiffs, though.

(3) The biggest reason the defendants can no longer use § 4303 to justify their treatment of the plaintiffs is that they officially ended automatic isolation on the CCU in 2019. So capital-case prisoners are prancing all around SCI Phoenix like any other Joe; meanwhile, § 4303 is still on the books.

So is their conduct *currently* unlawful? or was it unlawful for the past 50 years?

Section 4303 is an attractive place to anchor a state-created liberty interest. Plaintiffs could also root reasonable expectations for liberty in DOC policies, such as the sections of DC-ADM 802 that outline criteria for entry into, and removal from, solitary confinement. *See* doc. 46 at 22-23. But the Rehnquist Court said not to do that.

The point is that Pa. law is not the equivalent of the prison regulations in cases, like *Prieto*, cited by the defendants to argue heightened baselines and the categorical absence of liberty interests for the death-condemned. It is precisely the opposite: § 4303 places prolonged solitary confinement *outside* the "perimeters" of a death sentence.

When the plaintiffs were sentenced, they had a reasonable expectation of being incapacitated by the Commonwealth. They could even have expected to be put to death some day (in an arguably constitutional, i.e., minimally humane, manner). What they did not expect, what nobody could expect—what a Just society should have never tolerated!—was placement in a torture chamber designed to affect the slow "disintegration" of their "identit[ies]." *Williams,* 848 F.3d at 556.

Given what was known about the catastrophic deleterious effects of solitary confinement by the time *Williams* was decided in 2017, it is evident that plaintiffs' conditions were so severe in kind and degree, so "qualitatively different," as to constitute a wildly *un*expected departure from the sentence imposed upon them. *Vitek v. Jones*, 445 U.S. 480, 492 (1980); *see also Sandin*, 515 U.S. at 497 (Breyer, J. dissenting). That is, this Court could (but need not) construe the plaintiffs' claim as asserting an *independent* liberty interest safeguarded by the Due Process Clause "of its own force." *Sandin*, 515 U.S. at 484; *see also Renchenski v. Williams*, 622 F.3d 315, 325-26 (3d Cir 2010).

So how, then, was soul-crushing, ego-destabilizing isolation "within the expected perimeters" of a capital sentence? because the defendants said so? because that's what they've always imposed? because some other death-penalty states (but not all) do the same thing? The defendants venture no answers to these questions.

This would typically be where some penological rationale might be offered. But that argument has been abandoned, too, in light of the literature exposing the Death-Row Boogeyman Myth (*see Williams* at n. 180; Compl. at ¶¶ 174-76), and in light of the smooth transition (which is 2+ years advanced by now) to a new, less-restrictive CCU.

The plaintiffs are eager for discovery on this matter because they think they know the Truth: aside from satisfying dark retributive impulses, the conditions on Death Row may have had something to do with state and federal subsidies, given to individual institutions contingent upon operating segregated CCUs. That is, this whole thing—all the hurt, all through the years—may have been about *vengeance* and *money*. When documents start being produced at the pleasure of this Honorable Court, we shall see.

For now, this Court should not be impressed by the double-dog-dicta present in *Williams* and the defendants' fatally flawed reasoning that precipitated it. After all, at the outset of the decision, the court noted, as it had to, that they "took no position on whether actively death-sentenced prisoners' continued confinement on Death Row is justifiable." 848 F.3d at n. 2.

Now the defendants assert that *Williams* somehow granted immunity prospectively. But that's not a real thing. Rather, there's an entire corpus of law that evolved to guide the drawing of analogies from precedent. So far, the defendants have ignored these doctrines. This Court cannot.

### D. Because the plaintiffs' liberty interest was clearly established in a materially identical case, the magistrate properly denied qualified immunity.

Defendants ballyhoo the *Williams* dicta, but this Court knows an unfair partisan position when it sees one. On the flip side, the plaintiffs point to *Williams* as locking-in the jurisprudential shift, but they know the court was constrained to stop a bit short. While there was no advance grant of immunity, the holding *was* limited to its facts (as holdings tend to be). The immunity question looks like it could be close.

Enter the Wisdom of the High Court. In *United States v. Lanier*, the Court equated the "fair warning" requirement for liability under vague criminal statutes to the standard applicable to defeat qualified immunity from civil damages. 520 U.S. 259, 271 (1997). With regard to the "level of specificity sufficient" to constitute "fair warning," Justice Souter spoke, uncannily, to the issue of this moment: "when an earlier case expressly leaves open whether a general rule applies to the particular type of *conduct* at issue, a very high degree of prior factual similarity may be required." *Id.* at 271.

So, if this Court was concerned about whether liability was even *possible*, given that the question (about actively death-sentenced prisoners' rights) was "expressly [left] open" by *Williams*, the Supreme Court provides the answer: it is possible. Defendants could be liable, particularly if "a general constitutional rule . . . appl[ies] with obvious clarity to the specific *conduct* at issue." *Id.*

---

#### *Conduct* or *Victim*?

Emphasis was added to both *Lanier* quotes to highlight, as a side note, that the focus is on the conduct—not the victim. Suppose that, prior to *Lanier*, there had been a case establishing that rape by a public official qualifies as a criminal deprivation of civil rights under 18 U.S.C. § 242. Would it be a proper for a court assessing David Lanier's *conduct* to consider the distinguishing characteristics between the *victims* in the cases? Why do that here?

---

17

Recall the handy factual-congruity diagram on page 30 of the plaintiffs' brief opposing dismissal. The case that built on *Lanier*, *Hope v. Pelzer*, was another warning to lower courts about "the dangers of rigid overreliance on factual similarity." 536 U.S. 730, 742 (2000). *Hope* rejected the necessity of "fundamental[]" or "material[]" similarity. *Id.* at 741. It follows that the case at bar need only be "sufficiently analogous" to precedent to overcome an immunity defense in this jurisdiction. *Kane v. Barger*, 902 F.3d 185, 195 (3d Cir. 2018).

Given the "expressly open" question, however, the plaintiffs' case—in order to be considered "sufficiently analogous"—probably needs more than "some factual correspondence," which is usually enough. *Hicks v. Feeney*, 770 F.2d 375, 380 (3d Cir. 1985).

This case wields a strong man's mallet and rings the bell at the very top of the factual-affinity index. The sole difference between *Williams* and this case is the active death sentences. But, in the absence of some statutory justification, some penological rationale, *or something*, that distinction dissolves to total immateriality. Near-exact factual congruence has thus been achieved. And, as *Williams* itself proclaimed, "requiring that precedent and subsequent disputes rest on identical facts [in order to defeat qualified immunity] would license state actors to violate constitutional rights with impunity simply by varying some irrelevant aspect" of their conduct. 848 F.3d at 570.

Here, the defendants had not varied *anything*. The conduct itself—baseless, prolonged isolation on the CCU—was identical. The Third Circuit Court of Appeals, singing at the top of its "jurisprudential voice," belted out (loud enough to be heard in the Virgin Islands), that "the dehumanizing effect of solitary confinement is firmly established." *Id.* at 567. Nothing about the plaintiffs' death sentences immunized them

from those disastrous effects or plausibly justified their continued isolation.

And the defendants suggest nothing. That should be dispositive.

The defendants' advocacy stopped at the liberty-interest inquiry as if they had hit the page limit. Beyond quoting a few tidbits of qualified-immunity law, they provide no substantive analysis. They continue to shirk their burden-holders' obligation to destroy the plaintiffs' analogy—just as they refused to *draw* that same obvious analogy in the wake of *Williams* (even with the ACLU knocking at their door). Their willfully blind eyes missed the fair warning, but that doesn't mean it wasn't there for all to see.

They've literally taken it for granted, but the defendants are not entitled to qualified immunity on the plaintiffs' due-process claim. Or at all.

## Conclusion

Even if this court could look past the obvious cruelty of the defendants' conduct, it could not make out the *precise* contours of the plaintiffs' fact-intensive Eighth Amendment claim without the benefit of discovery—and would therefore have a hard time comparing it to the as-applied challenge in *Porter v. Pa. Dep't of Corr.* Dismissal is unwarranted at the pleading stage.

Enough is known, however, about the process afforded to all plaintiffs in cases of this category: there was none. Under the law of this circuit, the plaintiffs had a liberty interest, which was most clearly established in 2017. The reasoning of *Williams v. Sec'y* applied with obvious clarity here. Focusing on the capital sentences unduly elevates an immaterial factual nuance. The defendants are not entitled to qualified immunity.

For all these reasons, and those outlined in doc. 46, this Honorable Court should adopt Chief Magistrate Judge Mehalchick's well-reasoned report in full.

**Submitted respectfully,**

**George Lopez**, #CZ3198

**Darien Houser**, #GC7509

**Gerald Watkins**, #DD5212

**Ralph Stokes**, #AY9034

**Jose Uderra,**
(address pending)

**Richard Poplawski,** #KB7354

⭐ **resident at:**
State Correctional Institution Phoenix
1200 Mokychic Drive
Collegeville, PA 19426

**Date:**

Sept 6, 2022

### Certificate of Timely Filing

I certify, subject to the penalties of 28 U.S.C. § 1746, that the following is true:

- The plaintiffs received the defendants' objections via a third-party mail-processing contractor mandated by the Pa. DOC on **August 25, 2022**. *See* ex. A.

- According to Fed.R.Civ.P. 72(b)(2) and M.D. Local Rule 72.2, responses to objections are due within 14 days of service. Thus, this brief is due on **September 8, 2022**.

- Out of caution, the plaintiffs moved for an extension of time. But the plaintiffs have flexed their diligence and industry, and met the original deadline.

- This brief shall be placed in the prison mail receptacle, marked for pre-paid, certified U.S. Mail ( ___7020 0640 0000 4627 8864___ ) on **September 6, 2022**.

### Certificate of Compliance - Word Count

According to M.D. Local Rule 7.8, this brief must certify compliance with the word-count limit of 5,000 words because it is over 15 pages.

The word-processing software used to compose this document (Microsoft Word*Pad*) does not have a word-count feature. But there's a method to estimate: with an average of 12 words on each line, and about 20 lines on each page (given headers, orphan-minding, etc.), there are surely less than **4600 words** on the 19 pages from the Introduction to the Conclusion.

### Certificate of Service

I certify that a copy of this *Brief in Response* has been served on counsel for the defendants via first-class U.S. Mail, postage pre-paid, on the date indicated below:

**Kim Adams, Esq.**
PADOC Ofc. of Gen. Counsel
1920 Technology Parkway
Mechanicsburg, PA 17050

Respectfully—and timely—filed, certified, and served,

**Richard A. Poplawski**                                     **Date** 9/6/22
SCI Phoenix, # KB7354
1200 Mokychic Drive
Collegeville, PA 19426

21

Exhibit





Ex. A



PB1006

**pennsylvania**
DEPARTMENT OF CORRECTIONS

Governor's Office of General Counsel
1920 Technology Parkway
Mechanicsburg, PA 17050
www.cor.pa.gov



received
8/25/22
@ 1:45 PM



FIRST-CLASS

US POSTAGE ℠ PITNEY BOWES

ZIP 17050
02 7H       $ 001.29⁰
0006016249    AUG 17 2022

Smart Communications/PADOC
Richard Poplawski, KB7354
SCI-Phoenix
PO Box 33028
St. Petersburg, FL 33733

33733$8028 B099

Ref: 3847542 pg 1 of 20 for RICHARD POPLAWSKI



Inspected
by #3

Inspected
by #3