IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GEORGE IVAN LOPEZ**, *et al.*, | : CIVIL ACTION NO. 3:21-CV-1819 |
| | : |
| **Plaintiffs** | : (Judge Conner) |
| | : |
| v. | : |
| | : |
| **JOHN E. WETZEL**, *et al.*, | : |
| | : |
| **Defendants** | : |

**<u>MEMORANDUM</u>**

Plaintiffs, six *pro se* capital prisoners, bring this putative class action against the Pennsylvania Department of Corrections ("DOC") and three former Secretaries of Corrections, John E. Wetzel, Jeffery A. Beard, and Martin F. Horn, individually and in their official capacities (collectively "defendants"), alleging violations of the Eighth and Fourteenth Amendments, the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act. Defendants move to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds of qualified immunity. Presently before the court are defendants' objections to the report and recommendation of the Honorable Karoline Mehalchick, Chief United States Magistrate Judge, who recommends denying their motion *in toto*. After careful *de novo* review, we will grant defendants' motion to dismiss plaintiffs' Fourteenth Amendment claim and deny it in all other respects.

**I.      Factual Background & Procedural History**

Plaintiffs are currently incarcerated on death row at State Correctional Institution ("SCI") Phoenix. (<u>See</u> Doc. 1 ¶¶ 4-9). Prior to their placement at SCI

Phoenix, plaintiffs spent time in the Restricted Housing Units ("RHUs") at the now-defunct SCI Graterford, which closed in 2018, and SCI Greene, which maintained a capital population until 2020. (See id. ¶¶ 17, 90, 100, 112, 119, 127, 135). In addition to capital prisoners, RHUs typically included a mix of other inmates who had been segregated from the general population for disciplinary infractions or other reasons. (See id. ¶ 21). Noting that state law requires prison officials to hold capital inmates in solitary confinement only "upon receipt of [a death] warrant," (see id. ¶ 18 (quoting 61 PA. CON. STAT. § 4303)), plaintiffs allege that prison officials needlessly kept them in isolation for durations ranging from eight to thirty-two years pursuant to DOC Policy 6.5.8, "Capital Case Administration," which the DOC overhauled in December 2019. (See id. ¶¶ 4-9, 20).

Plaintiffs draw a stark contrast between their experiences as RHU residents and the ordinary incidents of prison life for the general prison population. (See id. ¶¶ 67-89). They claim that the DOC imposed "severe restrictions on personal property," enforced weekly mandatory cell searches "routinely" resulting in the destruction of their possessions, and exposed them to pervasive, "incessant noise" and foul odors from feces, vomit, and spoiled food. (See id. ¶¶ 23-26). Prison officials allegedly served plaintiffs lower-quality meals and issued them inferior mattresses than the general population, which plaintiffs say contributed to sleep deprivation and physical ailments. (See id. ¶¶ 28-29). Plaintiffs contend that they were confined to their roughly 8'-by-12', permanently illuminated cells for twenty-two hours per day on weekdays, with few furnishings and "limited room for movement and exercise." (See id. ¶¶ 31-32, 35-36). They further allege that the

DOC regularly made them relocate to different, often unsanitary cells within the RHU every ninety days, causing stress and fomenting an enduring "sense of instability." (See id. ¶¶ 33-34).

Plaintiffs allege that the DOC afforded them three showers each week under close supervision and that prison guards strip-searched them and applied handcuffs and nylon tether restraints akin to dog leashes whenever they left or returned to their cells. (See id. ¶¶ 39-41, 60-64). Time spent outside in the "yard" purportedly meant being left in "small outdoor cages with concrete surfaces, not appreciably larger than their cells." (See id. ¶ 37). On holidays, weekends, and days with inclement weather, plaintiffs were not permitted to leave their cells at all. (See id. ¶ 38). The DOC allegedly barred plaintiffs from participating in communal dining, congregate religious activities, vocational training, educational opportunities, rehabilitative programs, organized recreational events, and most prison jobs. (See id. ¶¶ 46-53). Visitations, telephone privileges, and overall human contact were severely restricted. (See id. ¶¶ 55-59).

Regarding health matters, plaintiffs aver that their "only option[s] for medical care" were non-confidential "cell-front consultations," where services like mental health assessments typically were perfunctory and lasted only minutes. (See id. ¶¶ 42, 54). Emphasizing the purported inadequacy of those practices, plaintiffs identify numerous severe cognitive, psychological, and physical conditions and disabilities with which they claim to suffer, including:

- anxiety and depression; auditory and visual hallucinations; claustrophobia; dissociative fugue disorder; manic episodes; mood disorders; panic

> attacks; paranoia; post-traumatic stress disorder; self-mutilation; suicidal ideations;

- blackouts resulting in lacerations from falls; brain damage; diabetes; early-onset arthritis; headaches; hypertension; orthopedic injuries; obesity; rapid weight loss and gain; sciatica; wheelchair dependency;

- chronic sleep inertia; insomnia; hypersomnia; and

- dyslexia and other unspecified learning disorders.

(See id. ¶¶ 91-92, 94-96, 101-06, 113, 115-17, 120-21, 123, 128, 130-31, 136-37, 140-41). Several plaintiffs assert that the DOC denied them the necessary care to manage particular maladies, including psychiatric treatment, pain medication, physical therapy, and surgery, as well as specific accommodations like handicap-accessible shower facilities. (See id. ¶¶ 98-99, 108-11, 118).

Plaintiffs charge former DOC Secretaries Horn, Beard, and Wetzel with "determin[ing the] rules, regulations, and policies regarding management and overall operation of the Department, including" the RHU, and "authoriz[ing] or condon[ing] the policy of housing" capital inmates "in solitary confinement indefinitely and without rationale." (See id. ¶¶ 10-14). Plaintiffs believe that the cramped conditions and prolonged isolation occasioned by defendants' RHU policies and failure to provide adequate medical care caused or exacerbated many of their ailments. (See id. ¶¶ 93, 102, 108, 110, 114, 122-23, 129, 139). Lastly, plaintiffs note that their recurring grievances and requests for care and accommodations put defendants on notice of their preexisting and detainment-related health issues—to no avail. (See id. ¶¶ 98-99, 109, 111, 118, 125-26, 133-34, 143-44).

Plaintiffs acknowledge that their conditions of confinement changed considerably in December 2019 with the DOC's implementation of Policy 7.5.1, "Administration of Specialized Inmate Housing," supplanting prior directives in many respects.[1]  (See id. ¶ 65; see also Doc. 33, Ex. A, DOC Procedures Manual, Policy No. 7.5.1, § 2 – Capital Case Unit (CCU) Phase I Inmates (hereinafter "Section 2")).[2]  Among the policy's noteworthy changes, capital inmates no longer are held in solitary confinement as a matter of course.  (See Section 2(C)).  The DOC also revised the reporting requirements for prison staff who observe signs of mental decompensation and distress.  (See Section 2(P)).  Each inmate must receive physical and mental health screenings from registered nurses and licensed psychologists, as well as an individualized treatment plan when his needs require one.  (See Section 2(B)).

The new policy relaxes previous limits on visitations, phone privileges, and available work assignments.  (See Sections 2(D)-(F)).  The DOC eliminated the

---

[1] This policy shift followed the preliminary approval of the class action settlement agreement in Reid v. Wetzel, No. 1:18-CV-176, Doc. 48 (M.D. Pa. Nov. 20, 2020).  See Johnson v. Pa. Dep't of Corr., 846 F. App'x 123, 126 (3d Cir. 2021) (nonprecedential).

[2] When reviewing a motion to dismiss, courts generally are limited to considering the complaint's allegations, "exhibits attached to the complaint, matters of public record, [and] undisputedly authentic documents if the complainant's claims are based upon these documents."  Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).  The court may, however, consider "document[s] integral to or explicitly relied upon in the complaint."  Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014) (quoting In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997)).  Plaintiffs explicitly refer to Policy No. 7.5.1, (see Doc. 1 ¶ 65), but do not include a copy of it with their complaint.  They do not contest the authenticity of the version defendants attached to their motion.

omnipresent cell lights, the ninety-day cell transfers, and the compulsory strip-searches and tethering.  (See Section 2(C)(2)-(5)).  Capital inmates now enjoy congregate meals, group religious activities, counseling sessions, educational opportunities, and organized recreational programs.  (See Sections 2(H)(4), (J), (K)).  They also are permitted significantly more time out-of-cell for exercise and recreation.  (See Section 2(H)).  And they may shower and shave daily.  (See Section  2(H)(8)).  Although more severe restrictions may be reimposed on a case-by-case basis, for the most part, the new policy treats capital inmates more like the general prison population.[3]

Notwithstanding the DOC's capital-unit reforms, on October 26, 2021, plaintiffs filed the underlying complaint pursuant to 42 U.S.C. § 1983.  They seek class certification under Federal Rule of Civil Procedure 23(b)(3) or, alternatively, Rule 23(b)(1).  Relying upon the doctrine of qualified immunity, defendants move to dismiss plaintiffs' constitutional claims.  (See Doc. 32).  Judge Mehalchick recommends that we reject that defense and deny defendants' motion.  (See generally Doc. 53).  Defendants object to her report and recommendation, (see Doc. 58), and plaintiffs respond, (see Doc. 75).[4]  The matter is fully briefed and ripe for disposition.

---

[3] That said, in the event the governor signs an execution warrant or the secretary issues a notice of execution, the affected capital inmate "convert[s] to Phase II status," which triggers the reimposition of DOC Policy 6.5.8.  (See Section 2(S)).

[4] In the supporting brief filed with their motion to dismiss, defendants also raised a distinct challenge to plaintiffs' claims under the ADA and Rehabilitation Act as applied to Wetzel, Beard, and Horn, contending that those statutes do not

6

## II. <u>Legal Standards</u>

### A. **Standard of Review for a Motion to Dismiss**

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief may be granted. See FED. R. CIV. P. 12(b)(6). When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)). In addition to reviewing the facts contained in the complaint, the court may also consider "exhibits attached to the complaint, matters of public record, [and] undisputedly authentic documents if the complainant's claims are based upon these documents." Mayer, 605 F.3d at 230 (citing Pension Benefit Guar. Corp., 998 F.2d at 1196).

Federal notice and pleading rules require the complaint to provide "the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Phillips, 515 F.3d at 232 (alteration in original) (quoting Bell Atl. Corp. v. Twombly,

---

provide a private cause of action against individual defendants. (See Doc. 33 at 3, 12-15). However, defendants did not include this claim in the motion itself. In any event, Judge Mehalchick recommends denying relief on this issue because plaintiffs expressly disclaim any attempt to hold the individual defendants liable for monetary damages and limit their statutory claims to the DOC. (See Doc. 53 at 6 n.1). Defendants do not object to the report on this basis. Finding no error on the face of the report in this regard, we adopt the report's recommendation and deny relief on this claim.

550 U.S. 544, 555 (2007)).  To test the sufficiency of the complaint, the court conducts a three-step inquiry.  See Santiago v. Warminster Township, 629 F.3d 121, 130-31 (3d Cir. 2010).  In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'"  Id. at 130 (alteration in original) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)).  Next, the factual and legal elements of a claim must be separated; well-pleaded facts are accepted as true, while mere legal conclusions may be disregarded.  Id. at 131-32; see Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).  Once the court isolates the well-pleaded factual allegations, it must determine whether they are sufficient to show a "plausible claim for relief."  Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556); Twombly, 550 U.S. at 556.  A claim is facially plausible when the plaintiff pleads facts "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.

      **B.**     **Standard of Review for a Report & Recommendation**

We review *de novo* the portions of a magistrate judge's report and recommendation to which a party timely objects and we may accept, reject, or modify, in whole or in part, any findings or recommendations.  See 28 U.S.C. § 636(b)(1); Local R. 72.31; Brown v. Astrue, 649 F.3d 193, 195 (3d Cir. 2011); Sample v. Diecks, 885 F.2d 1099, 1106 n.3 (3d Cir. 1989).  As a matter of good practice, we examine the remainder of the report for clear error.  See Univac Dental Co. v. Dentsply Intern., Inc., 702 F. Supp. 2d 465, 469 (M.D. Pa. 2010) (Conner, J.) (citing Henderson v. Carlson, 812 F.2d 874, 873 (3d Cir. 1987); Fed. R. Civ. P. 72(b), advisory committee notes).

8

**III.     Discussion**

Defendants assert that they are entitled to qualified immunity as applied to plaintiffs' Eighth and Fourteenth Amendment claims.  (See Doc. 58 at 9-16). Qualified immunity protects a state actor who has committed a constitutional violation if the plaintiff's rights were not "clearly established" when the individual acted.  Pearson v. Callahan, 555 U.S. 223, 243-45 (2009).  Liability will not attach if a reasonable actor could have believed the challenged conduct complied with settled law.  Id. at 244; see also Springer v. Henry, 435 F.3d 268, 280 (3d Cir. 2006).  The doctrine cloaks government officials with "immunity from suit rather than a mere defense to liability," Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (emphasis omitted), and "ensure[s] that insubstantial claims against government officials [will] be resolved prior to discovery."  Pearson, 555 U.S. at 231-32 (second alteration in original) (quoting Anderson v. Creighton, 483 U.S. 635, 640 n.2 (1987)).  The defense generally "protects 'all but the plainly incompetent or those who knowingly violate the law.'"  Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

Defendants bear the burden of establishing qualified immunity.  Beers–Capitol v. Whetzel, 256 F.3d 120, 142 n.15 (3d Cir. 2001).  Faced with such a defense, a court must consider two distinct inquiries: whether, based upon the facts alleged, a constitutional right has been violated and, if so, whether the right was "clearly established" at the time of the alleged violation.  Spady v. Bethlehem Area Sch. Dist., 800 F.3d 633, 637 (3d Cir. 2015) (quoting Pearson, 555 U.S. at 232).  In determining whether a right is clearly established, we first begin with applicable

Supreme Court or Third Circuit precedent; if none exists, we look for a "robust consensus of cases of persuasive authority" among the other federal courts of appeals.  See Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist., 877 F.3d 136, 142 (3d Cir. 2017) (quoting Taylor v. Barkes, 575 U.S. 822, 826 (2015)).  We may begin our analysis with either prong.  See Pearson, 555 U.S. at 237.

In the matter *sub judice*, defendants argue that the constitutional rights asserted by plaintiffs were not clearly established when the alleged violations occurred.  (See Doc. 58 at 9-12).  They also claim that plaintiffs lack a cognizable liberty interest in avoiding confinement on death row that is protected by the Fourteenth Amendment's Due Process Clause.  (See id. at 12-16).  Plaintiffs' responses largely track the report's analysis.  (See Doc. 75 at 3-4, 7-19).[5]  We address plaintiffs' claims under the Eighth and Fourteenth Amendments in turn.

### A.    Eighth Amendment

Courts apply a two-pronged test to assess claims that a prison official has inflicted cruel and unusual punishment in violation of the Eighth Amendment.  "First, the deprivation alleged must be 'objectively, sufficiently serious.'"  Farmer v. Brennan, 511 U.S. 825, 834 (1994) (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)).  To rise to that level, "a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.'"  Id. (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)).  When an inmate contends that a prison official

---

[5] Plaintiffs also briefly challenge the constitutional underpinnings of qualified immunity itself, but concede, as they must, that only the United States Supreme Court can reexamine the doctrine's continuing vitality.  (See Doc. 75 at 4-5).

10

failed to prevent some injury, he "must show that he is incarcerated under conditions posing a substantial risk of serious harm." Id. (citing Helling v. McKinney, 509 U.S. 25, 35 (1993)).

Second, the inmate must prove that the prison official acted with "'deliberate indifference' to inmate health or safety." Id. at 837 (quoting Wilson v. Seiter, 501 U.S. 294, 302-03 (1991)). This requires proof that the official perceived the risk and yet disregarded it. Id. In other words, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. Inmates may meet their burden by demonstrating that "the risk of harm was 'longstanding, pervasive, well-documented, or expressly noted by prison officials in the past' such that [they] 'must have known' about the risk." Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 259 (3d Cir. 2010) (quoting Farmer, 511 U.S. at 842-43). Courts evaluating this subjective prong "may also consider whether officials 'had a legitimate penological purpose' behind their conduct." Porter v. Pa. Dep't of Corr., 974 F.3d 431, 446 (3d Cir. 2020) (quoting Ricks v. Shover, 891 F.3d 468, 475 (3d Cir. 2018). Punishments lacking penological justification violate the Eighth Amendment. Id. (citing Hope v. Pelzer, 536 U.S. 730, 737 (2002)).

Here, plaintiffs contend that their lengthy stints in solitary confinement contravened the Eighth Amendment's Cruel and Unusual Punishments Clause. (See Doc. 1 ¶¶ 167-81). Defendants do not contest that "prolonged solitary confinement . . . poses a substantial risk of serious psychological and physical harm." See Porter, 974 F.3d at 441; see also id. at 441-44 (collecting cases and

summarizing scientific and medical research recognizing the "highly detrimental" effect of solitary confinement on inmate health). Instead, they rejoin that our court of appeals already has recognized their entitlement to qualified immunity for virtually identical claims arising out of a contemporaneous lawsuit challenging the conditions of confinement under the same DOC policy. (See Doc. 33 at 8-10 (citing Porter, 974 F.3d at 436, 450).

In Porter, the Third Circuit reviewed constitutional challenges to the DOC's capital unit housing policy brought by Ernest Porter, an inmate at SCI Greene who had been held in solitary confinement for thirty-three years, including sixteen years after a court vacated his death sentence. Porter, 974 F.3d at 435-38. Characterizing that duration as "extreme," the court found that Porter had provided sufficient evidence of the "severe detrimental impacts" to his mental health that he experienced while in the DOC's custody on death row, including "severe anxiety, depression, panic, paranoia, bipolar mood swings, and . . . suicidal impulses." Id. at 437, 444. Citing then-Secretary Wetzel's comments specifically, the court observed that the defendants previously had acknowledged the substantial risks attendant to solitary confinement protocols like theirs, which the panel deemed "obvious, longstanding, pervasive, well-documented, and expressly noted by prison officials in the past." Id. at 445 (cleaned up). Taken together, the court concluded that a reasonable jury could find that the defendants disregarded a known danger by leaving Porter in isolation for more than three decades. Id. at 447. Nonetheless, the court dismissed Porter's Eighth Amendment claim, reasoning that the right asserted had not been clearly established. Id. at 450. "[F]rom this point forward,"

however, the court proclaimed that "such prolonged solitary confinement satisfies the objective prong of the Eighth Amendment test and may give rise to an Eighth Amendment claim, particularly where" prison officials fail to "provide any meaningful penological justification" for their policies. Id. at 451.

We agree with Judge Mehalchick that plaintiffs undoubtedly satisfy both prongs of the Eighth Amendment test. (See Doc. 53 at 12-13). Defendants do not dispute this point. They focus instead on the fact that plaintiffs' claims mirror Porter's in relevant part and that the conduct alleged in both cases would have occurred before December 2019, when the DOC overhauled its restrictive housing protocols. (See Doc. 58 at 11-12). That timeline is critical, they say, because the right plaintiffs' now claim entitlement to had not been clearly established until our court of appeals decided Porter in September 2020. (See id. at 12). To reinforce their point, defendants note that the Third Circuit dismissed another case challenging the DOC's practice of holding capital inmates in solitary confinement on qualified immunity grounds just last year. (See Doc. 58 at 10 (citing Johnson v. Pa. Dep't of Corr., 846 F. App'x 123, 129 (3d Cir. 2021) (nonprecedential)).

Plaintiffs couch their Eighth Amendment claims under the theory of "*Solitary+*, that is prolonged isolation *plus* some additional factor(s) to make it a little more cruel." (See Doc. 46 at 19 (emphasis in original)). Those plus factors include plaintiffs' mental illnesses and suicidality, as well as the unsanitary conditions and sleep deprivation to which prison officials allegedly subjected them. (See id. (citing Palakovic v. Wetzel, 854 F.3d 209, 225 (3d Cir. 2017); Allah v. Bartkowski, 574 F. App'x 135, 138-39 (3d Cir. 2014))). In denying qualified

13

immunity, Judge Mehalchick credited those distinctions, reasoning that plaintiffs allege the DOC denied their "rights to mental health treatment," which she found to be clearly established. (See Doc. 53 at 13-14 (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976); Goodrich v. Clinton Cnty. Prison, 214 F. App'x 105, 111 (3d Cir. 2007); Bowring v. Godwin, 551 F.2d 44, 47 (4th Cir. 1977); Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994); Stuart v. Pierce, No. 17-CV-934, 2022 WL 605821, at *9 (D. Del. Feb. 24, 2022); Langley v. Coughlin, 715 F. Supp. 522, 540 (S.D.N.Y. 1989)). Contesting that distinction, defendants stress that the grants of qualified immunity in Porter and Johnson "necessarily included all components of the conditions those prisoners experienced," including their "allegations that mental health treatment was inadequate" under the former policy. (See id. at 10-11).

Although it is a close question, we are persuaded that plaintiffs' specific allegations implicate their right to adequate medical treatment, which was clearly established in the law as far back as 1976. See Estelle, 429 U.S. at 104-05 ("[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment.") (internal quotations and citation omitted); Goodrich, 214 F. App'x at 110-11 ("A mental illness may include a serious medical need.") (citing Inmates of the Allegheny Cnty. Jail v. Pierce, 612 F.2d 754, 763 (3d Cir. 1979)); see also Palakovic, 854 F.3d at 229 (concluding that parents of a mentally ill inmate who died by suicide sufficiently pled that prison officials rendered "constitutionally [in]adequate" treatment and contributed to his deteriorating mental health through "the harsh and unforgiving confines of solitary confinement"). As in Palakovic, plaintiffs

14

sufficiently allege that defendants were aware of and yet deliberately indifferent to their serious mental health needs, denied them necessary care to manage their conditions, and further impaired their already fragile psyches by wantonly subjecting them to solitary confinement without penological justification.  (See Doc. 1 ¶¶ 42, 54, 90-144).[6]

Defendants' resort to Porter and Johnson is unavailing.  It is true that both cases involved some allegations that the inmates' mental health deteriorated while in solitary confinement and that the DOC provided inadequate mental health care.  But neither involved the extensive psychological profiles and diagnoses, detailed histories of mental decompensation, patterns of self-harm, and particular instances of unrequited appeals for treatment presented here.  (See, e.g., Doc. 1 ¶¶ 91-94, 98, 101-03, 109-10, 113-18, 120-22, 128-30, 133-34, 136-39, 143-44).  For instance, Johnson generally claimed that he suffered "irreversible damage" to his mental health and

---

[6] We also acknowledge our court of appeals' recent decision in Clark v. Coupe, ___ F.4th ___, 2022 WL 17246324 (3d Cir. Nov. 28, 2022), which was published after the close of briefing in this case.  In Clark, the court reversed a grant of qualified immunity to prison officials who held a non-capital inmate in solitary confinement despite manifest harm to the prisoner's mental health, reasoning that "imposing conditions that cause the 'wanton and unnecessary infliction of pain' had long violated the Eighth Amendment."  See Clark, 2022 WL 17246324, at *10 (quoting Rhodes, 452 U.S. at 347).  The court cited Palakovic favorably in reaching that conclusion; however, it cautioned that conditions-of-confinement claims are "separate and distinct from challenges addressing access to medical care."  See id. at *5.  Although both Palakovic and Porter involved some allegations that prison officials deprived prisoners of adequate mental health treatment, the Clark Court clarified that those allegations were not "essential" or "necessary" elements to the distinct conditions-of-confinement claims raised in those cases.  See id.  Here, by contrast, the DOC's alleged failure to provide necessary mental health treatment is central to the plaintiffs' Eighth Amendment challenge.

15

that he experienced "suicidal and violent impulses" (among other mental health disorders) as a result of his confinement, but he did not further substantiate those claims or allege that prison officials were aware of his conditions and denied treatment for them.  See Johnson v. Wetzel, No. 4:18-CV-1924, Doc. 3 ¶¶ 17, 21 (M.D. Pa. May 14, 2018).  Consequently, Johnson's passing references to his mental health in his complaint did not factor into the district court's Eighth Amendment analysis at all and was only briefly mentioned by our court of appeals.  See Johnson, 846 F. App'x at 125; see also Johnson v. Wetzel, 209 F. Supp. 3d 766 (M.D. Pa. 2016).  Likewise, the district court in Porter found no record evidence that the plaintiff "required or requested (and did not receive) additional mental health services" beyond those provided on a weekly basis or through his cell door, or that the defendants "were aware that available mental health treatment was insufficient for Porter's claimed mental health diagnoses."  Porter v. Pa. Dep't of Corr., No. 17-CV-763, 2018 WL 5846747, *4 (W.D. Pa. Nov. 8, 2018).  Thus, these decisions cannot bear the dispositive weight that defendants would have us place upon them.

We will overrule defendants' objections to Judge Mehalchick's recommended denial of qualified immunity on plaintiffs' Eighth Amendment claims and deny their motion to dismiss on that basis.

**B.     Fourteenth Amendment**

Defendants also contend that Judge Mehalchick erroneously concluded that plaintiffs have a liberty interest in challenging their solitary confinement protected by the Fourteenth Amendment.  (See Doc. 58 at 12-13 (citing Doc. 53 at 20)).  For a liberty interest to be recognizable in the prison context, the asserted right "must

16

confer 'freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" Griffin v. Vaughn, 112 F.3d 703, 708 (3d Cir. 1997) (quoting Sandin v. Conner, 515 U.S. 472, 484 (1995)).  The parties differ on whether the proper baseline for measuring atypicality is the ordinary incidents of prison life among the general population of prisoners or those on death row.  (See Doc. 58 at 13-14; Doc. 75 at 11, 15).  We need not wade into that debate today.  We assume without deciding that plaintiffs' asserted liberty interest in challenging the conditions of their confinement constitutes a right protected by the Due Process Clause of the Fourteenth Amendment.  Plaintiffs are due no relief because they cannot show that such a right was clearly established at the time the DOC subjected them to the former housing policies.

In Porter, the Third Circuit noted that it previously had recognized "a due process liberty interest in avoiding indefinite detention in solitary confinement"— but only for those capital inmates who were awaiting resentencing after their sentences had been vacated.  See Porter, 974 F.3d at 438 (citing Williams v. Sec'y Pa. Dep't of Corr., 848 F.3d 549, 559-65 (3d Cir. 2017)).  The court expressly declined to decide "whether inmates who have not been granted" sentencing relief have the same interest.  Id. at 438 n.2 (citing Williams, 848 F.3d at 552 n.2).  And it has not yet held that they do.  Nor do plaintiffs cite any favorable authority on this issue from the other courts of appeals.  Unlike Porter and Williams, plaintiffs here remain subject to "active and viable" death sentences.  See Williams, 848 F.3d at 552 n.2. Thus, even if we assume that they, too, have a right to challenge their solitary

confinement under the Due Process Clause of the Fourteenth Amendment, we are constrained to conclude that such a right was not clearly established at the time of the alleged conduct, which predated <u>Porter</u>.  Accordingly, plaintiffs' Fourteenth Amendment claim fails, and defendants are entitled to qualified immunity on this issue.

### IV.    Conclusion

We will grant defendants' motion to dismiss plaintiffs' Fourteenth Amendment claim and deny it in all other respects.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:    November 30, 2022